**BANCO URQUIJO, S.A., formerly Banco de Progreso, S.A., Banco Natwest Espana, S.A., Plaintiffs,**

v.

**SIGNET BANK/MARYLAND, et al., Defendants.**

**No. 1:CV-93-0012.**

United States District Court, M.D. Pennsylvania.

Aug. 23, 1994.


Andrew Hilton Dowling, Lloyd R. Persun, Mette, Evans & Woodside, Harrisburg, PA, for plaintiffs.

David P. King, Philip H. Wright, Pamela M. Williams, Hogan & Hartson, Baltimore, MD, for defendants.

## OPINION

MUIR, District Judge.

### I. Introduction.

This case involves a claim by two Spanish banks against three American banks and one Japanese bank stemming from substantial loans made by all six to Intershoe, Inc., a designer, importer, and wholesaler of ladies' shoes. When Intershoe filed a petition in bankruptcy the Spanish banks were unsecured creditors of Intershoe in the approximate amount of $1,500,000. The American banks had extended a credit line to Intershoe in the approximate amount of $40,000,000, fully secured by Intershoe's accounts receivable, inventory and cash plus a foreign exchange line of $75,000,000. The Japanese

bank had lent Intershoe $2,500,000 originally unsecured but on the date of the bankruptcy similarly fully secured. The American and Japanese banks will probably suffer no loss. The Spanish banks will recover nothing on their loans to Intershoe.

On January 6, 1993, Plaintiff Banco de Progreso, S.A. ("Progreso"), filed a complaint against Defendants Signet Bank/Maryland ("Signet Maryland"), Signet Bank/Virginia ("Signet Virginia"), Philadelphia National Bank ("PNB"), Corestates Bank, N.A. ("CoreStates"), and The Bank of Tokyo Trust Company ("Tokyo Trust"), alleging unjust enrichment, fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. Subsequently, Progreso changed its name to Banco Urquijo, S.A., and Banco Natwest Espana, S.A. ("NatWest"), was added as a Plaintiff. We will enumerate the claims set forth in the complaint so as to illuminate the significance of certain of our findings of fact.

Plaintiffs allege that the Defendants enjoyed a special relationship of confidence with Progreso which was the lead Spanish bank. Progreso had an account with Signet Virginia and Signet Maryland and Progreso shared common ownership and a common director with Signet Banking Corporation (Complaint ¶ 47). It is claimed that Defendants on February 15, 1990, with Signet Maryland acting as agent and lead lender, lent to Intershoe, Inc. ("Intershoe"), a business engaged in designing and selling ladies' footwear, an aggregate amount in excess of $31,500,000 (Complaint ¶¶ 8 and 9); before making the loan, Defendants familiarized themselves with Intershoe's financial condition and operations (Complaint ¶ 12); collateral for the loan included Intershoe's inventory, accounts receivable, and cash (Complaint ¶ 11); and Intershoe purchased its inventory primarily from manufacturers in Spain (Complaint ¶ 19). Intershoe on February 18, 1992, filed a petition under Chapter 11 of the Bankruptcy Code in the Middle District of Pennsylvania, Harrisburg Division, Case No. 1–92–00419 and on April 1, 1992, liquidated all of its assets (Complaint ¶ 8).

The Plaintiffs claim that the Defendants orchestrated the introduction of Progreso

and Intershoe to arrange an unsecured line of credit for Intershoe with Progreso in Spain to enable Intershoe to make inventory purchases there (Complaint ¶¶ 13 through 17); on the basis of a favorable recommendation from Peter Godfrey, account executive employed by Signet Maryland to service Intershoe's loan account, a line of unsecured credit was opened between Progreso as lender and Intershoe as borrower under a Credit Facility Agreement dated September 6, 1990 (Complaint ¶ 17); Intershoe subsequently drew money on its line of credit to purchase inventory from manufacturers in Spain (Complaint ¶ 19); these purchases inured directly to Defendants' benefit by enhancing Intershoe's inventory, accounts receivable and cash in which Defendants enjoyed a first priority security interest (Complaint ¶¶ 19 and 34); Intershoe paid the revolving line of credit that it had with Plaintiffs without default prior to September 6, 1991, the month in which the line of credit was scheduled to expire (Complaint ¶¶ 19 and 20); when the line of credit was being considered for renewal Progreso contacted Mr. Godfrey requesting Defendants' updated opinion of Intershoe's financial condition (Complaint ¶ 20); Progreso received a facsimile telecopy on May 9, 1991, stating that the Defendants continued to have a "favorable opinion" of Intershoe (Complaint ¶ 22); this was a misrepresentation and the Defendants did not notify Progreso at any time thereafter that Defendants' opinion of Intershoe had changed (Complaint ¶¶ 49 and 52); in reliance on the Defendants' favorable opinion of Intershoe, Progreso renewed the line of credit on September 6, 1991 (Complaint ¶ 23); Progreso advanced Intershoe $1,450,934.03 during the period November 14 through December 20, 1991 (Complaint ¶ 24); this amount was used by Intershoe to purchase shoes from Spanish manufacturers (Complaint ¶ 24); Progreso's $1,450,934.03 in advances to Intershoe remain outstanding (Complaint ¶ 48); in the course of Intershoe's liquidation, Defendants have recovered the proceeds of their collateral and applied such proceeds to the indebtedness owed them by Intershoe (Complaint ¶ 31). NatWest joined Progreso in the original loan, advanced half of it, and agreed to assume one-half of the risk (Amended Complaint ¶ 2b).

A non-jury trial was held on June 13 through 17, July 6 through 8, July 11 through 15, July 18 through 22, July 25 through 29, and August 1, 1994, a total of 24 trial days. The parties submitted 703 proposed findings of fact, 204 of which were undisputed. The following are the Court's findings of fact, discussion, and conclusions of law.

## II. Findings of Fact.

### A. THE PARTIES

1. Prior to March 1993 and at all times material hereto, Progreso was a merchant bank (also known as a "wholesale bank") located in Spain. (Undisputed, hereafter referred to as "U")

2. Progreso was founded in 1979 in Mallorca, Spain with one branch and a main office. (U)

3. By 1990, Progreso had five branches in Spain—Madrid, Barcelona, Zaragosa, Sevilla and Valencia. (U)

4. Progreso's Board of Directors consisted of seven or eight individuals. (U)

5. Progreso's clientele consisted of high net worth individuals and corporations. (U)

6. Approximately 95% to 98% of its loans were unsecured. (U)

7. The March Group consists of two brothers and two sisters, Juan March Delgado (hereafter referred sometimes in the undisputed findings as "March" or "Mr. March"), Jose Carlos March Delgado, Leonor March Delgado and Gloria March Delgado (the "March Family"), and the corporations which they control. (U)

8. Juan March together with his brother, Carlos, has acted as the leader of the March Group and has directed their banking interests. (U)

9. March served as chairman of Progreso's board of directors until 1993 when Banco Urquijo, S.A. merged into Progreso. (U)

10. From 1988 through March 1993, the March Family controlled more than 59% of the issued and outstanding shares of capital

stock of Progreso and elected its Board of Directors. (U)

11. In March 1993, Banco Urquijo, S.A. merged into Progreso as the surviving corporation. Progreso then changed its name to Banco Urquijo, S.A. (U)

12. Banca March, S.A. ("Banca March") also is part of the March Group. (U)

13. Plaintiff NatWest is a Spanish bank. (U)

14. Defendant Signet Maryland is a Maryland bank whose headquarters are located in Baltimore, Maryland. (U)

15. Defendant Signet Virginia is a Virginia bank whose headquarters are located in Richmond, Virginia. (U)

16. Signet Virginia and Signet Maryland are wholly owned subsidiaries of Signet Banking Corporation which is the successor to Bank of Virginia Company. Signet Virginia is the successor to Bank of Virginia. (U)

17. Signet Investment Banking Corporation is a wholly owned subsidiary of Signet Banking Corporation. (U)

18. Defendant PNB was a Pennsylvania bank whose headquarters were located in Philadelphia, Pennsylvania. (U)

19. Defendant CoreStates is a national bank whose headquarters are located in Philadelphia, Pennsylvania. CoreStates is a successor in interest to PNB. (U)

20. Defendant Tokyo Trust is a bank maintaining offices at 100 Broadway, New York, New York. (U)

21. Signet Maryland was agent and lead lender for Signet Virginia, PNB/CoreStates and Tokyo Trust. (U)

22. Progreso is part of the March Group of business interests in Spain. Those interests include banking, shipping, chemicals, building materials, cement and real estate. Progreso is a bank, not a wholesaler or retailer of shoes. At all relevant times a majority of the Progreso shares were owned by the March Group. (U)

23. Progreso had correspondent banking relationships with many banks in the United States, going back to 1976. (U)

24. A correspondent banking relationship facilitates certain activities between foreign banks such as letter of credit transactions and currency exchange.

25. During the time period relevant to this case, Progreso had correspondent banking relationships with Signet Virginia and Signet Maryland. It maintained two bank accounts, one with Signet Virginia in Richmond, Virginia and the other with Signet Maryland in Baltimore, Maryland. (U)

## B. THE MARCH GROUP INVESTMENT IN SIGNET BANK

26. In 1978, the March Group decided to invest in a bank in the United States. (U)

27. Banca March did not intend to control the bank where the investment was to be made. (U)

28. March desired that the board of directors of the bank or bank holding company where the investment was to be made accept Banca March unanimously to avoid dissension. (U)

29. The board of directors of the initial candidate for the investment, Virginia National Bank (later Sovran Bank), did not accept Banca March unanimously; therefore, the search continued. (U)

30. The March Group chose Bank of Virginia Company because it thought that it would be a good investment. Before making the investment, the March Group employed lawyers and investment bankers and did research and analysis to determine whether the investment was a sound one. The March Group also required four years' audited financial statements of the Bank of Virginia Company and demanded numerous representations and warranties, including a representation that there had been no material changes in the Bank of Virginia Company's financial condition.

31. The Bank of Virginia Company and Banca March, for itself and its subsidiaries and affiliates as the Purchaser, entered into a Stock Purchase Agreement as of June 30, 1979. That agreement without the exhibits thereto is Exhibit P93. (U)

32. That agreement (15.10) provides in part as follows:

The purchaser [Banca March, S.A. and/or any of its subsidiaries or affiliates] has full confidence in the company's present management [Bank of Virginia Company and Bank of Virginia]. The purchaser has no wish to interfere with, and will not attempt to control, the management policy or affairs of the company. . . .

Stock Purchase Agreement 15.10, Exhibit P93.

33. The initial investment was approximately $20,000,000.00 in cash, which Banca March paid to Bank of Virginia Company in exchange for approximately 15% of its issued and outstanding shares of common capital stock. (U)

34. Leopoldo Caravantes worked for Banca March from 1969 until 1985. His responsibilities included developing "foreign business with clients of the bank or potential clients." From 1985 to the present he has been employed by NatWest.

35. In 1985, Mr. Caravantes became General Manager of the International Division of NatWest which at that time was a part of the March Group. (U)

36. Mr. Jose Leva, who then was Mr. Caravantes' deputy in the International Department of Banca March, purchased the dollars with pesetas in order to make the investment. (U)

37. The March Group agreed to a number of restrictions imposed by the Federal Reserve Board. Pursuant to these restrictions, the March Group, through Banca March, did not control the Bank of Virginia Company. (U)

38. The purposes of the investment were to achieve capital appreciation, diversify the March Group's investments, and enable the banks' employees to learn about American banking.

39. Due to the restrictions imposed by the Federal Reserve Board, the March Group could have only one director on the board of the Bank of Virginia Company. (U)

40. March agreed to the restrictions imposed by the Federal Reserve Board because he did not want any of the March Group entities to be classified as a bank holding company. The restrictions included limits on owning shares in other American financial institutions, restrictions on banking transactions between the March Group and Signet Banking Corporation, and restrictions on interfering with or controlling the management, policies, or affairs of Signet Banking Corporation. By agreeing to these restrictions, the March Group satisfied the Federal Reserve Board that it would not control the bank.

41. After closing on the transaction, Mr. March was designated a director of Bank of Virginia Company, later Signet Banking Corporation, and Bank of Virginia, later Signet Virginia. (U)

42. March remained a director on those boards of directors until April 1991, when Alfredo Lafita replaced him as director. (U)

43. Mr. Lafita is Juan March's second cousin and Juan March selected him as the March Group's nominee. (U)

44. Mr. Lafita served as director for one year as the nominee of the March Group until its investment was sold in spring 1992. (U)

45. During 1990 and until April 1991, Mr. Lafita was not on Progreso's Board of Directors. (U)

46. In 1986, Bank of Virginia Company acquired Union Trust Company of Maryland. (U)

47. Thereafter, Bank of Virginia Company changed its name to Signet Banking Corporation, Bank of Virginia changed its name to Signet Virginia and Union Trust Company of Maryland changed its name to Signet Maryland. (U)

48. In 1986, Banca March made an additional investment in Bank of Virginia Company in order to maintain its 15.22% investment. (U)

49. Until spring 1992, when its investment was sold, the March Group's total investment remained approximately 16% (U)

50. During his tenure as a director, Juan March's communications with Signet officials about business affairs were limited to conversations on general topics.

51. Juan March never told anyone at Signet Banking Corporation or its subsidiaries ("Signet") that he had expectations about how Signet should act towards Progreso.

52. After the investment by the March Group in the Bank of Virginia and before and after Progreso's loan to Intershoe, more than 10 but less than 30 Progreso employees traveled to Signet Virginia in Richmond to study American banking. Juan Cazalla in October and November 1990 traveled to Signet Maryland in Baltimore to study American banking. Prior to June 1991, Mr. Cazalla was assistant manager of correspondent banking for Progreso. After June 1991, Mr. Cazalla was head manager of international investments for Progreso. (U)

53. Cazalla visited Signet Maryland in October–November 1990 to find out who Signet Maryland's customers were and how Signet Maryland's International Division did business. (U)

54. During his training visit in October and November, 1990, Mr. Cazalla met Jeanne Derderian who then was an assistant vice president of Signet Maryland in its International Department. (U)

55. Ms. Derderian had a farewell party for Mr. Cazalla at her home on the last day of his training visit. (U)

56. These 10 to 30 people who visited Signet Virginia were junior level employees, generally 25–26 years old. (U)

57. These training visits lasted from several weeks to several months.

58. Korean bankers also visited Signet Maryland for training.

59. It is not unusual for foreign banks to send representatives to American banks to receive training and gain a better understanding of American banking.

60. Wallace B. Millner, an officer of Signet Banking Corporation, Signet Virginia, Signet Maryland, Signet Bank, N.A. and Signet Investment Banking Corporation, traveled to Spain in 1980 to learn about the March Group and ways of doing business with it. He visited Spain again in 1988 or 1989. Between 1980 and 1989 Mr. Millner met Jose Leva Rios ("Leva"), head of Progreso's International Division, and also Claudio Boada Palleras ("Boada"), Progreso's General Manager. (U)

61. Sanfjord B. Teu III is an Executive Vice President of Signet Virginia in charge of its money center and reports to Wallace B. Millner, the Chief Financial Officer. (U)

62. Millner had previously met Leopoldo Caravantes, then an employee of Banca March, when the investment by the March Group (through Banca March, S.A.) was first made in 1979. (U)

## C. LOAN TO INTERSHOE BY SIGNET, ET AL.

63. Intershoe was a Delaware corporation which at all times material hereto maintained its administrative offices at Pine and Church Streets in Millersburg, Pennsylvania.

64. Intershoe was a designer, importer and wholesale distributor of quality brand name women's dress shoes with a distribution warehouse in Harrisburg, Pennsylvania. Intershoe imported shoes from foreign countries—primarily Italy, Yugoslavia and Spain—for sale to retailers in the United States. (U)

65. In 1988, Intershoe obtained a revolving line of credit through Signet Maryland to finance its working capital needs in the United States. The line of credit, and all subsequent modifications and renewals, are hereinafter referred to as the "Revolver". (U)

66. The Revolver was established as a $30,000,000 line of credit. PNB and First Pennsylvania Bank participated with Signet Maryland in the credit, forming a bank group in which Signet Maryland acted as lead lender. (U)

67. On May 3, 1988, Signet Maryland modified the Revolver to consent to the leveraged buyout of Intershoe by one of its executives, Ivan Rempel. (U)

68. The Revolver was an "asset-based" loan which was secured by Intershoe's inventory and accounts receivable which included

cash. Funding under the Revolver was dependent upon the value of the collateral on any given day after Signet Maryland's review of the daily activity reports submitted by Intershoe to Signet Maryland each day. Intershoe drew on the Revolver for its working capital needs. (U)

69. Signet Virginia and PNB also provided Intershoe with a foreign exchange line of credit facility (the "FX Line of Credit") in 1988. (U)

70. The collateral securing Intershoe's obligations to Signet Virginia and PNB under the FX Line of Credit included Intershoe's inventory, accounts receivable, which included cash. (U)

71. Thomas Reymann, a Vice President in Signet Maryland's Commercial Finance Division, was the original account officer for the Revolver. He remained the account officer until late 1989 or 1990. (U)

72. Intershoe purchased foreign exchange contracts from Signet Virginia and PNB/CoreStates. (U)

73. Sometime in late 1989 or early 1990, the Revolver was transferred within the commercial finance division to Peter Godfrey, a Vice President of Signet Maryland, and Noel Lassise, an Assistant Vice President of Signet Maryland. Ms. Lassise was the account officer for the Intershoe loan. (U)

74. Mr. Godfrey was also an account officer for the Revolver. He supervised Ms. Lassise. (U)

75. In the late summer of 1991, the Intershoe loan was transferred to Thomas Reymann, Vice President of Signet Maryland, and Timothy Lewis, Assistant Vice President of Signet Maryland. After the transfer, Mr. Lewis was the account officer for the Intershoe loan. (U)

76. Linda Douglas was a Vice President of PNB/CoreStates and one of its account officers for the Intershoe loan. (U)

77. By July 1990, after PNB and First Pennsylvania merged, the bank group consisted of Signet Maryland, PNB, and also Tokyo Trust ("Bank Group"). (U)

78. In the Bank Group, Signet Maryland acted as lead lender for Signet Virginia, PNB and Tokyo Trust. (U)

79. Signet Maryland used a risk rating system to assign risk categories to its loans. These categories were used to calculate the risk exposure.

80. The Intershoe loan was designated a "management attention" account which required the Commercial Finance Division of Signet Maryland to submit a quarterly report to the Senior Loan Committee of the bank on the status of the credit. Management attention reports were submitted in June 1990, January 1991, April 1991, and July 1991.

81. A management attention account was designated in 1989 by a rating of "4*." At some point in 1990, because of a change in the rating scale, the "4*" designation was eliminated and management attention accounts were rated "5." The change in Intershoe's risk rating from 4* to 5 reflected a shift in rating scales, not any perceived increase in risk. The ratings of 4* and 5 were no worse than "OAEM" (Other Assets Especially Mentioned) or "OLEM" (Other Loans Especially Mentioned) on the federal rating scale. OAEM/OLEM loans were commonly referred to as "honorable mention" and were not considered problem loans. The ratings of 4* and 5 could have been equal to the highest federal rating, "Pass."

82. PNB/CoreStates had the following categories for rating loans: 1) pass; 2) pass EWOC (Especially Worthy Of Comment); 3) OAEM (Other Assets Especially Mentioned); 4) substandard; 5) doubtful; 6) loss. (U)

83. The Revolver received a risk rating of "pass" as of May 1988 from PNB/CoreStates. (U)

84. The Revolver received a risk rating of "substandard" from PNB/CoreStates as of February 1, 1991. (U).

85. PNB/CoreStates rated the Intershoe account as "substandard" as of February 1, 1991, because in the view of its credit department there was a deterioration in Intershoe's liquidity, excessive leverage in overtrading, negative cash flow, high rates of advance given the level of dilution, seven million dol-

lars in advances by Intershoe to its affiliates which were financially weak and these advances exceeded Intershoe's net worth. (U)

86. Linda Douglas, the PNB account officer at the time, has no recollection of telling Signet Maryland of the classification change. (U)

87. Signet Maryland was unaware of CoreStates' risk rating of the Intershoe loan.

88. Signet and CoreStates had different opinions about the Intershoe loan. Signet had a more positive and optimistic view than CoreStates.

89. It is common to have different perceptions of a loan within a bank group.

90. Intershoe was a seasonal business and was subject to fashion and industry risk. (U)

91. The Intershoe loan was a large one and was termed a highly leveraged transaction—a loan made to a company with substantial debt resulting from a leveraged buyout. Highly leveraged transactions were automatically rated "management attention" according to Signet Maryland policy.

92. The Intershoe loan was an asset-based loan, meaning that the bank group looked to the collateral as its primary source of repayment. Asset-based loans at Signet Maryland typically were highly leveraged. In Signet Maryland's asset-based loans, covenant defaults, advance rates fluctuation, overlines and overadvances were not unusual. By definition, asset-based borrowers were short on cash because their cash needs were funded by bank debt and trade debt.

93. Asset-based loans had been profitable and successful for Signet Maryland.

94. As a management attention account the Intershoe loan was an acceptable credit and not considered substandard; the management attention rating meant that as a large, highly leveraged account, the Intershoe loan was monitored by top management at the bank.

95. The loan risk rating for Intershoe at Signet Maryland did not change until December 1991 when Intershoe was placed on the watch list.

96. Most of the accounts during the 1990–1991 time period for Signet Maryland's Asset Based Lending Department or Commercial Finance Division were management attention accounts requiring quarterly reports to Senior Loan Committee. (U)

97. As of July 1990, the structure of the credit extended by the Bank Group included the Revolver of $40,000,000 and the FX Line. Signet Maryland approved a $3,000,000 overline, until September 30, 1990. (U)

98. An overline is an additional approved extension of credit, beyond the Revolver cap. (U)

99. As of September 1990, the structure of the credit extended by the Bank Group, including the Revolver, the FX Line of Credit, and a $3,000,000 overline provided by Signet Maryland, is explained in Exhibits P157 and 155. (U)

100. As of September 1990, availability of loan advances under the Revolver was calculated at a total of 80% of eligible accounts receivable and 50% of inventory.

101. The Credit Memorandum of September 10, 1990, indicates that through July 31, 1990, Intershoe earned a gross profit of $622,000. Sales for August were reported in excess of $22 million, $6 million higher than for August 1989. Net profit for the fiscal year ending on August 31, 1990, was expected to be greater than $2 million.

102. As of September 1990, Signet Maryland was a 45% participant in the Revolver, PNB/CoreStates had 45% and Tokyo Trust had 10%. (U)

103. As of September 1990, PNB was a 45% participant in the FX Line of Credit, and Signet Virginia was a 55% participant. (U)

104. In September 1990, Intershoe requested an increase in the $3,000,000 overline to $5,000,000 and an extension of the September 30, 1990 maturity date to October 31, 1990. Signet Maryland granted this request with the understanding that the overline would reduce to $3,000,000 by October 31, 1990 and expire on November 30, 1990. (U)

105. The Credit Memorandum dated September 10, 1990, indicates that the Commer-

cial Finance Division of Signet Maryland recommended the increase to the temporary overline, from $3 million to $5 million, because the following factors were viewed as a "plus": Collateral, Certainty of Collections/Payout, and Value of Relationship. The only negative factor was "Total Exposure."

106. The increase to the temporary overline was approved on or about September 13, 1990.

107. The $5,000,000 overline was not reduced on October 31, 1990 and was not eliminated by November 30, 1990. (U)

108. Westinghouse Credit Corporation had made a subordinated secured term loan to Intershoe originally in the amount of $10,000,000. In the fall of 1990, the Defendants (Bank Group), Intershoe and Westinghouse Credit Corporation entered into an agreement wherein certain payments required to be made by Intershoe to Westinghouse Credit Corporation would be deferred with payments (approximately $1.25 million) due by March 1, 1991. The agreement provided that if payments were not made by March 1, 1991, that this would constitute a default. The agreement also provided that past payments that were not made would not constitute a default. (U)

109. On September 28, 1990, Paul H. Hawkins, an Assistant Vice President of Signet Maryland in the Credit Department, performed a credit analysis of the Intershoe loan. The analysis by Mr. Hawkins is Exhibit P158. (U)

110. Mr. Hawkins' chief concerns were (a) the recent abrupt shift in Intershoe's top management; (b) an industry stalled by a weak retail environment with no immediate prospects for rejuvenation; (c) a concentration of sales to a limited number of major accounts some of which had questionable credit quality; (d) an illiquid and highly leveraged balance sheet; (e) a highly seasonal business, which caused Intershoe to experience large swings in gross and net profit margins during the course of a particular year. (U)

111. Hawkins stated that Intershoe was in a "precarious position." (U)

112. Mr. Hawkins further stated that:

These weaknesses are particularly worrisome considering that the company is highly leveraged. Mounting losses have virtually wiped out equity and on a tangible net worth basis equity is sharply negative. Even without subtracting intangibles, at 5/31/90 the debt to worth ratio was 205.8x indicating that the bank is acting more as an investor than a lender. Given the illiquidity of the company, and the bank's exposure to this risk, a glitch in the trading asset turnover of Intershoe will jeopardize the bank's position. (U)

113. Mr. Hawkins concluded that "as a result of these concerns, it is recommended that the bank begin to work out of this exposure." (U)

114. Hawkins' observations were partly correct and partly incorrect.

115. Hawkins' conclusions were evident to anyone possessing Intershoe's financial statements and publicly available information.

116. Hawkins' analysis was performed and filed in the Intershoe file while Lassise was on maternity leave. It was not discovered by the members of the Commercial Finance Division until months later.

117. No one in the Commercial Finance Division agreed with Hawkins' analysis. Also, Hawkins' supervisor in the Credit Department, Tom Schmidt, did not agree with the analysis.

118. On February 12, 1991, Noel Lassise wrote a response to Hawkins' analysis. Lassise's response is Exhibit P203. (U)

119. Lassise's response reflected the thinking of Signet Maryland about Intershoe except for Hawkins who is no longer employed at Signet.

120. Lassise's analysis concluded: "While it is true that Intershoe is highly dependent on seasonal sales volume to cover fixed expenses, it is recognized as a risk that can be and has been managed by the company."

121. Signet Maryland believed that Hawkins' recommendation to work out of its loan to Intershoe was "erroneous" and the result

of an "extremely superficial financial analysis of [Intershoe]." Hawkins' analysis was "his opinion alone and [was] not shared" by Lassise, Godfrey, or Bronfein, the head of the Commercial Finance Division.

122. At a Bank Group meeting on November 1, 1990, the president of Intershoe, Ivan Rempel, made a report to the Bank Group. Rempel's comments are reported in the notes of Michael Bronfein, at that time the head of Signet Maryland's Commercial Finance Division. The notes are included in Exhibit P164. (U)

123. Mr. Rempel also commented that the single biggest problem for Intershoe in 1990 "has been" its inability to pay vendors. (U)

124. As of January 4, 1991, a new bank group was proposed to be formed on March 1, 1991, with the participants in the Revolver consisting of Signet Maryland at 40%, PNB/CoreStates at 30%, United Jersey Bank at 17%, and First Valley Bank at 13%. (U)

125. In the proposed new bank group with PNB/CoreStates, United Jersey Bank, and First Valley Bank, Signet Maryland's share of the Revolver would have increased from $18 million to $20 million.

126. On January 25, 1991, United Jersey Bank and First Valley Bank dropped out of the proposed new bank group. (U)

127. The Bank Group (Signet Maryland, Signet Virginia, PNB/CoreStates and Tokyo Trust) met on January 29, 1991, as indicated on Exhibit P195. (U)

128. On January 29, 1991 Ivan Rempel told the Bank Group that he was concerned about Intershoe's ability to operate even on a reduced basis on an 80/50 advance formula "during the time spent after August 1991" due to the seasonal fluctuations in the business. (U)

129. In January 1991, Michael Bronfein, head of Signet Maryland's commercial finance (asset-based lending) division, visited Macy's to gather information about Intershoe's account receivable from Macy's. Bronfein also monitored Intershoe's relationship with ShoeBox, another important customer of Intershoe.

130. On February 15, 1991, the Bank Group and Intershoe closed another co-lending arrangement. The loan structure, including the Revolver, the FX Line of Credit, and a temporary overline of $5,000,000 is explained in P206. (U)

131. The borrowing base formula would begin at 85% of Intershoe's accounts receivable and 60% of its inventory and by August 31, 1991 would be reduced to 80% of Intershoe's accounts receivable and 50% of its inventory. (U)

132. As of February 15, 1991, the participation structure of the FX Line of Credit is explained in Exhibit P206. (U)

133. The Term Sheet dated February 21, 1991, and the Credit Memorandum dated March 28, 1991, which are Exhibits P206 and 216, respectively, explain the structure of the new lending arrangement, including the Revolver, a $5,000,000 temporary line increase, and the FX Line of Credit. (U)

134. Under this participation, Signet Maryland's exposure from April 30, 1991 through September 1991 was to be $23 million; PNB's exposure was to be $18 million, and Tokyo Trust's exposure was to be $4 million. (U)

135. As of March 1991 the structure of the credit extended by the Bank Group is explained in Exhibit P216. (U)

136. Signet Maryland's Commercial Finance Division updated Intershoe's financial performance for the spring 1991 season, ending on February 28, 1991. The evaluation is found in the Credit Memorandum of March 28, 1991, which is Exhibit P216. (U)

137. Signet Maryland concluded: "Although the Spring 1991 season did not reflect the profits Intershoe had anticipated, the company operated at budgeted levels. The posting of a minimal seasonal loss for the Spring season is consistent with historical trends and considered by the company and this writer to be adequate performance in a tough retail environment." The writer was Noel J. Lassise.

138. Signet Maryland also measured Intershoe's performance against financial covenants in the loan documents establishing the Revolver. Intershoe satisfied the covenants at February 28, 1991.

| Covenant | Actual |
|---|---|
| Stockholders equity no less than $4,200,000 | $4,321,000 |
| Current Ratio no less than .90 to 1 | 1.06 to 1 |
| Capital Base no less than $9,400,000 | $9,500,000 |
| Sr. Debt/Capital Base no greater than 8.5 to 1 | 7.80 to 1 |
| Tangible Capital Base no less than $900,000 | $1,842,000 |

139. As stated in Exhibit P216, due to the seasonal nature of Intershoe's business, the loan documents establishing the Revolver did not require Intershoe to meet the levels in the financial covenants until the next measurement date. The next date for measuring Intershoe's performance against the financial covenants was August 31, 1991. (U)

140. Before joining the Bank Group, Tokyo Trust had also provided Intershoe with an unsecured revolving line of credit. At some time in 1990, Intershoe defaulted on Tokyo Trust's unsecured line. In February 1991 with the consent of the Bank Group, Tokyo Trust's unsecured line of credit was converted to a secured term loan, sharing first priority in the collateral with the Revolver. (U)

141. Intershoe was a Shared National Credit ("SNC") because it was a loan over $20,000,000 shared by two or more national banks. The federal regulators reviewed the Intershoe loan file at Signet Maryland in February 1991. As a shared national credit, Intershoe received a so-called SNC review. At that time, the regulators were extremely aggressive. The regulators had the power to recommend the downgrading of a loan's risk rating and, if a bank failed to comply with such a recommendation, the bank would be subject to severe sanctions. The federal regulators recommended no change in Intershoe's risk rating after the SNC review in February 1991.

142. A collateral examination conducted by Signet Maryland was performed at Intershoe's warehouse and offices for the period covering November, 1990–January, 1991. As a result of that examination, a written report was generated March 18, 1991. This written report is Exhibit P213.

143. The collateral audit summary reported that Intershoe postdated selected invoices to jobbers. The Bank Group had known about Intershoe's use of dated terms since at least June 1990. Dated terms are a recognized factor in most lending relationships, especially the shoe business, and dated terms disclosed to the bank group were not falsifications.

144. A collateral examination, conducted by Signet Maryland was performed at Intershoe's offices for the period covering February—April, 1991. As a result of that examination, a written report was generated June 6, 1991. This written report is Exhibit P230. (U)

145. Exhibit P230, the audit report summary, indicates that the advance rates for accounts receivable (85%), current season inventory (60%) and prior season inventory (30%) were supportable because of Intershoe's "[e]xcellent management information systems," which allowed for "detailed collateral analysis"; "[c]omplete credit files which are updated timely throughout the year"; and Intershoe's "proven ability to sell out of prior seasons shoes."

146. In addition, the audit report noted that "Intershoe's accounting system is highly sophisticated and reliable. The analysis Intershoe performs on their customer base and inventory allows the Bank to monitor the collateral efficiently and effectively."

147. Exhibit P230, like other audits performed by the Bank Group, supported the advance rates to Intershoe.

148. Intershoe wanted to obtain a larger line of credit and by reason thereof was interested in a larger bank as lead bank.

149. In the spring and summer of 1991, Intershoe began negotiating with other banks to lead a new syndication.

150. In addition, Intershoe retained Signet Investment Banking Corporation to find an equity investor.

151. During the summer of 1991, the Bank of New York was being pursued to assume the lead lender role in a new bank syndication to be formed September 30, 1991. (U)

152. The Bank of New York did not deliver a commitment. Other possible lead lenders were pursued including Mellon Bank and Citicorp. (U)

153. In early 1991, Intershoe received a letter of intent for a $15,000,000 equity infusion from Three Cities Research ("TCR"). (U)

154. Signet Maryland wanted to continue its lending relationship with Intershoe after the equity infusion by TCR and the creation of a new syndicate to be headed by Mellon Bank.

155. Signet Maryland anticipated joining the new Mellon syndication as a minority participant.

156. TCR proceeded with its "due diligence investigation" of Intershoe through the spring of 1991. TCR was "hot to close" on its proposed equity investment in Intershoe by June 30, 1991.

157. TCR did not close on the equity investment in June 1991 because Ivan Rempel, Chief Executive Officer and sole shareholder of Intershoe, was negotiating further about certain terms of the investment relating to TCR's control of Intershoe's board of directors in the event of a default.

158. In May 1991, an audit was conducted by Signet Maryland at Intershoe's office in Millersburg and warehouse in Harrisburg. The auditor reported:

Irwin Schiller indicated that the payment situation to be critical and cooperation from the factory is diminishing. Mr. Schiller showed an internal document from their Italian office indicating a strike that had taken place for eight hours because of nonpayment. The deterioration of the aging spread coupled with the increase in total payables raises the risk of factories stopping production. The rates of advance extended to Intershoe are to drop to 80% (A/R) and 60% (inventory) on June 30, 1991. The drop in advanced rates comes during the peak of the fall shipping season. (U)

159. The Bank Group held a meeting on May 29, 1991, as indicated on Exhibit P225. (U)

160. At the Bank Group Meeting, it was noted that TCR was in the process of documenting its planned $15 million equity infusion, expecting to close the transaction by the end of June.

161. It was also noted that Intershoe predicted a $3.3 million profit before amortization. (U)

162. TCR was to provide the $15,000,000 equity infusion by June 1991. The TCR deal did not close by June 1991. (U)

163. The Bank Group held a meeting on July 29, 1991, as indicated on Exhibit P233. (U)

164. At the July Bank Group Meeting, it was reported that Intershoe projected sales of $20 million in July, and $20–$24 million in August, with a projected $170 million sales volume for the fiscal year ending August 31, 1991.

165. It was noted at the July 1991 Bank Group meeting that the TCR equity infusion had been placed on hold; there was no need to proceed until a new bank group was formed at which time the TCR transaction and the new bank group syndication could be closed simultaneously.

166. It is common for refinancing of debt and injection of equity to occur simultaneously.

167. It was expected that the TCR and Mellon transactions would occur at the same time.

168. At the Bank Group meeting on July 29, 1991, PNB/CoreStates indicated that it had no desire to participate in the new bank group to be formed after September 30, 1991. Signet Maryland indicated an interest in continuing to participate. (U)

169. The July 29, 1991 bank group meeting was the first time at which PNB/Core-

States had unequivocally stated that it had no interest in participating in a new syndication.

170. A Signet credit department analysis dated August 15, 1991 concluded: "Considering the retail environment in which Intershoe is operating, the Company's performance has progressed as well as, if not better than, could be expected."

171. Intershoe's payments to factories during the spring and summer of 1991 were regular and substantial.

## D. LOAN TO INTERSHOE BY PROGRESO (WITH NATWEST)

172. Braxton Glasgow was originally hired by the Bank of Virginia in 1986 in the Bank of Virginia's Investment Banking Unit. Very shortly thereafter, the Bank of Virginia became Signet Virginia. (U)

173. In October 1989, Glasgow resigned his position as an officer with Signet Investment Banking Corporation to take a position as a vice president with Intershoe. Glasgow started with Intershoe on November 1, 1989. (U)

174. It is not unusual for bank officers to accept employment with former customers of their banks.

175. Glasgow was hired by Rempel, the owner of Intershoe after the leveraged buyout, to establish an international group to distribute Intershoe's products outside the U.S. and Canada.

176. Glasgow never controlled the finances of Intershoe and had no responsibility for the company's day-to-day financial affairs. The persons responsible for those matters were Michael Hoke, Intershoe's controller, and Irwin Schiller, its treasurer. Progreso was aware by March 23, 1990, that Hoke and Schiller, respectively, were the controller and treasurer of Intershoe.

177. Not long after Glasgow assumed his new job, Rempel told Glasgow that he wanted to establish a new relationship with a Spanish bank because Intershoe dealt with Spanish shoe factories. (U)

178. Intershoe, an importer and distributor of women's dress shoes, desired to obtain financing from a new bank located in Spain to pay shoe factories there from which Intershoe purchased inventory. (U)

179. Glasgow suggested Progreso as a possibility.

180. Glasgow knew about Progreso from his employment at the Signet Investment Banking Corporation. (U)

181. Progreso was the only Spanish bank of which Glasgow had any knowledge. (U)

182. On November 13, 1989, Glasgow sent a letter to Millner, Glasgow's former superior, asking for an introduction to Progreso. (Exhibit P1).

183. It is common for bankers to introduce customers to other bankers.

184. Glasgow explained that Intershoe had had relationships with Spanish banks in the past and that Intershoe wanted to establish a new relationship with a Spanish bank for its financing needs in Spain. He requested that Millner introduce him, "at the appropriate level," to Progreso.

185. Glasgow also explained that two Spanish banks—Banco de Bilbao–Viscaya and Banco Santander—had terminated their relationship with Intershoe after the May, 1988 leveraged buyout because Intershoe's balance sheet at that time showed a negative tangible net worth.

186. Glasgow's letter explained that Banco de Bilbao–Viscaya and Banco Santander had provided letters of credit to Intershoe in favor of the Spanish factories. It explained that the banks used the letters of credit "as collateral" for discounting time drafts issued by Intershoe to the factories. As such, these loans were secured.

187. Glasgow noted that Signet Maryland was the lead lender in a $40,000,000 revolving credit facility to Intershoe.

188. When Millner received Glasgow's letter, he did not know whom to call at Progreso. He believes he contacted Enrique Pinel to ask to whom Glasgow's inquiry should be directed.

189. On November 22, 1989, Millner wrote to Boada at Progreso about Intershoe. The November 22, 1989, letter is Exhibit P2. (U)

190. By his November 22, 1989 letter, Millner introduced Intershoe to Boada, Progreso's General Manager, and requested that Michael Bronfein, Signet Maryland's account officer for Intershoe, provide to Progreso Intershoe's then most recent financial statements. (U)

191. In his letter of November 22, 1989, Millner enclosed Glasgow's letter of November 13, 1989, and asked Boada if Progreso would be interested in establishing a relationship with Intershoe.

192. Millner sent a second letter to Boada on December 12, 1989. That letter is Exhibit P3. (U)

193. In the letter of December 12, 1989, to Boada, Millner stated that Intershoe's year-end financial statements would be available in a few days, that Boada might receive them from both Intershoe and Signet, and that Millner had suggested to Glasgow that he contact Progreso directly. (U)

194. On December 12, 1989, Glasgow wrote a letter to Boada. That letter is Exhibit P4. (U)

195. In his letter to Boada, Glasgow enclosed the audited financial statements for Intershoe's most recently completed fiscal year which ended on August 31, 1989, and asked for a meeting in Madrid on January 15, 1990.

196. Boada and Leva agreed to meet with Glasgow in Madrid on January 15, 1990. (U)

197. Millner's involvement with Intershoe and Progreso ended with receipt from Boada of a copy of Boada's communication with Glasgow about the January meeting in Madrid, and thereafter Millner's involvement with Intershoe and Progreso ended.

198. Millner had no further communications with either Intershoe or Progreso about a possible loan.

199. Leva called Millner about Intershoe on January 11, 1990. Millner then was in California, so Leva spoke with Sanfjord B. Teu.

200. Teu reported directly to Millner, the Chief financial Officer of Signet Virginia. (U)

201. Teu discussed Intershoe with Leva in that telephone conversation. (U)

202. That same day, Leva wrote a memorandum to Boada about his conversation with Teu. The memorandum is Exhibit P9. (U)

203. Leva also enclosed with his memorandum to Boada a list of the Spanish factories in the Alicante region in Spain that had sold shoes to Intershoe. (U)

204. Teu did not learn that Progreso had made a loan to Intershoe until after this lawsuit was filed.

205. Boado was Leva's boss. (U)

206. Boada gave Leva Exhibits P1, P2, P3 and P4. (U)

207. Glasgow met with Leva and Boada on January 15, 1990. They talked for about 45 minutes. Glasgow gave them a packet of information including financial statements which had been provided by Intershoe's chief financial officer, Michael Hoke, and requested a line of credit from Progreso.

208. No representatives of the Defendants were present at the meeting. (U)

209. The 1989 audited financial statements of Intershoe, which Progreso received, are Exhibit P4. (U)

210. The 1989 audited financials show that Intershoe had secured debt of over $39 million. (U)

211. Glasgow's letter of November 13, 1989, which was sent to Boada by Millner, indicates that Signet Maryland was the lead leader for a $40 million revolving line of credit. (U)

212. Intershoe requested the loan from Progreso to pay shoe manufacturers in the Alicante region of Spain. Progreso did not have a branch in the Alicante region but NatWest did. Leva approached Leopoldo Caravantes, General Manager of NatWest's International Division, about participating in the loan to Intershoe. (U)

213. On January 17, 1990, Leva sent a memo to Boada regarding Intershoe. The memo is Exhibit P10. (U)

214. Leva gave four reasons for recommending a loan to Intershoe. First, he echoed his summary of his conversation with

Teu about Intershoe—"the company is owned by a person who is held in utmost esteem by Signet Bank and that the finances are controlled by a person who has Signet's full confidence." Second, Leva explained that if Progreso were obliged to take possession of a shipment of shoes, it could sell them to a buyer in the United States, thus protecting Progreso on its payments on the line of credit. Third, Progreso could request frequent financial statements—"almost monthly ones"—so that Progreso could monitor Intershoe. And finally, Progreso could reserve the right to withdraw from the loan at any time.

215. Progreso engaged in numerous international transactions on its own behalf and on behalf of its clients.

216. Progreso had a staff of analysts who examine financial aspects of credit and investment decisions. In considering the proposed transaction with Intershoe, it was always Progreso's decision whether to lend to Intershoe.

217. No one at Progreso or NatWest communicated with Banco de Bilbao–Viscaya or Banco Santander, Intershoe's previous Spanish banks, about their experiences with or evaluation of Intershoe.

218. No one at Progreso or NatWest communicated with the Spanish factories in Alicante about their credit experience with Intershoe.

219. On January 18, 1990, NatWest received a report about Intershoe from National Westminster Bank USA, which is Exhibit P12. (U)

220. The report indicated slowness by Intershoe in making payments to trade creditors and referred to a declination to release financial statements on August 28, 1989, by Intershoe's treasurer.

221. Caravantes requested National Westminster Bank USA to obtain P12. Edwin Fairman, head of the Department of Risks at NatWest, requested an "opinion" from National Westminster Bank USA. Caravantes received the credit report at the same time as or after he received the information from Leva about Intershoe. He considered the report "neutral", not negative.

If there had been anything negative in P12, he would not have made the loan to Intershoe.

222. Caravantes presented the loan proposal to NatWest's Risk Committee. (U)

223. Caravantes did not speak with Mr. Teu or Mr. Millner about Intershoe. (U)

224. Caravantes trusted Leva. He considered Leva knowledgeable of banking, a hard worker, intelligent, and willing to learn and develop business. (U)

225. In 1990 and 1991, Caravantes did not speak with any employee of any Defendant about Intershoe. (U)

226. The International Division of NatWest, headed by Caravantes, recommended participation with Progreso in the loan which involved "documentary credits" to Intershoe as indicated in the memorandum dated January 23, 1990.

227. In the memorandum of January 23, 1990, Caravantes did not mention that Signet Banking had recommended Intershoe; he mentioned that Signet Banking had "introduced" Intershoe to Progreso.

228. Caravantes also indicated that Intershoe would provide monthly financial information and that NatWest would oversee the proposed line "operation by operation."

229. NatWest had received referrals of other potential customers from other banks. It did not lend to all of those customers. NatWest made its own credit decisions, both in general and relating to Intershoe.

230. Fairman knew when the loan proposal was considered that Intershoe was highly leveraged, thinly capitalized, and financed by bank debt. The financial statement was "fairly typical" of NatWest's Spanish customers operating in the shoe industry or fashion sector. Fairman assumed that Signet was a leading participant in the secured line of credit to Intershoe. Fairman would not have made the loan based solely on the financial statements. Fairman never talked to anyone at Progreso, Signet, or Intershoe about the loan to Intershoe.

231. Progreso's Permanent Commission of Risks (the "PRC") met on January 24,

1990 to review the proposed Intershoe loan. Leva, although not a member of the PRC, attended the meeting. Antonio Blanco ("Blanco"), the head of Progreso's Department of Risks, served as the secretary to the PRC and presented the proposal regarding Intershoe. Leva also addressed the PRC. (U)

232. Blanco was not in favor of making a loan to Intershoe; based on his analysis of Intershoe's financial statements he concluded that Intershoe was undercapitalized and had too much debt.

233. Even though Progreso had received the November 13, 1989, letter of Glasgow to Millner which indicated that Signet Maryland was the lead lender for a $40 million revolving line of credit, and even though Intershoe's financial statements (which Progreso possessed) indicated that Intershoe had a secured loan to a bank group for approximately $39 million, Progreso and NatWest made no inquiries of Signet Maryland about the nature of the relationship between Signet Maryland and Intershoe.

234. Blanco indicated that he would have been taken aback, viewing a "recommendation" with considerable skepticism, if he had learned at the time that Signet Maryland's loan to Intershoe was secured by essentially all of Intershoe's assets.

235. The 1989 audited financial statements of Intershoe which Blanco had reviewed explain that Intershoe had a secured debt of over $39 million. The Glasgow letter of November 13, 1989, which had been enclosed with Millner's letter to Progreso, dated November 22, 1989, indicated that Signet Maryland was the lead lender in $40 million revolving credit facility. (U)

236. Progreso and NatWest were aware of the risks of lending to Intershoe, including the industry risk, the seasonal nature of the business, the fashion risk, and the recessionary environment. The Plaintiffs considered these risks in deciding whether to make the loan.

237. As a former employee of Banca March, Mr. Caravantes was closely involved in the investment made by Banca March in the Signet Banking Corporation (then Bank of Virginia Company) in 1979. (U)

238. Caravantes relied upon Leva whom he knew for many years as his former deputy at Banca March. (U)

239. NatWest, a participant in the line of credit, was required to evaluate the loan proposal in the same manner as it evaluated any other proposed loan. NatWest made its own decision on the proposed loan to Intershoe.

240. NatWest agreed to share the risk of the Intershoe loan 50–50 with Progreso. (U)

241. Progreso acted for itself and as agent and lead lender for NatWest. (U)

242. On February 2, 1990, Progreso confirmed with Caravantes that NatWest would be sharing 50% of the risk. (U)

243. On January 24, 1990, Progreso's PRC approved a loan to Intershoe for the opening of documentary credits for the maximum term of 60 days per advance. A memorandum dated January 25, 1990, reflecting the approval is Exhibit P15. (U)

244. It was the responsibility of both Progreso and NatWest to follow up on any concerns about the transaction.

245. Blanco informed Leva in the memorandum dated January 25, 1990, that the PRC had approved a loan to Intershoe involving "documentary credits." This meant that Progreso would pay for the shoes purchased by Intershoe on letters of credit and that such payments of such debts of Intershoe would be *secured* by the shoes. The loan as approved originally by the PRC was entirely secured.

246. Blanco also reported that the PRC felt it necessary to keep "close tabs" on the development of Intershoe and to obtain financial statements with "frequent periodicity."

247. Progreso was aware that Intershoe was undercapitalized and with substantial debt.

248. Progreso requested the personal guarantee of Mr. Rempel, Intershoe's President. Mr. Rempel declined to give the guarantee. (U)

249. Progreso did not discuss the guarantee issue with Signet.

250. On February 2, 1990, Francisco F. De Gamboa ("Gamboa"), manager of correspondent banking for Progreso and an employee in Leva's department, by letter informed Intershoe that Progreso had approved a line for documentary credits for up to 250 million pesetas. The letter is Exhibit P20. (U)

251. The terms of the approved line included a requirement that Intershoe furnish Progreso with monthly balance sheets and income statements and that Progreso have "the right to cancel this credit facility whenever he wants." (sic)

252. Rempel of Intershoe met with Leva in Madrid in March 1990. (U)

253. In a memorandum dated April 20, 1990, the Department of Risks, headed by Blanco, reminded Leva that the PRC had asked for financial information on Intershoe "with frequent periodicity." The memorandum asked Leva's Department to forward recent financial information on Intershoe; the last statements in Progreso's possession at that time were the audited financial statements for the year ending August 31, 1989.

254. On April 30, 1990, Intershoe and Progreso signed a loan agreement known in Spain as a "Credit Policy" (hereinafter, the "Loan Agreement", which is Exhibit P34, and a subsequent modification and a renewal, will be referred to as the "Plaintiffs' Line"). (U)

255. Intershoe was not required by the Loan Agreement to provide financial statements on a monthly basis. The Loan Agreement required Intershoe to provide its audited annual financial statements within six months after the end of the fiscal year and up-to-date financial statements when requested by Progreso. The renewal of the Loan Agreement contained the same requirement.

256. The Loan Agreement did not provide Progreso with the right to exit the loan on demand. The renewal of the Loan Agreement also did not provide Progreso with the right to exit the loan on demand.

257. The Loan Agreement gave Progreso the right to require Intershoe to deposit cash in an account at Progreso equal to the amount of the outstanding advances on the Plaintiffs' Line. The renewal of the Loan Agreement contained an identical provision.

258. On April 4, 1990, William H. Cowie, Jr., President of Signet Maryland wrote a letter to Jose Leva of Progreso confirming a visit by Mr. Leva, Mr. Boada and Mr. Rempel in Baltimore. Said letter is Exhibit P29. (U)

259. By letter dated April 20, 1990, Don M. Thompson, Senior Vice President of Signet Virginia, sent Mr. Leva a letter and itinerary for his visit to the United States wherein Mr. Leva and Mr. Boada would arrive in Richmond April 29, 1990 to meet with officers of Signet Virginia on April 30, 1990 in Richmond and meet with officers of Signet Maryland in Baltimore on May 1, 1990. Said letter and itinerary is Exhibit P33. (U)

260. Boada and Leva of Progreso met with the president of Signet Maryland, William Cowie, Bronfein, and Rempel of Intershoe for a luncheon in Baltimore on May 1, 1990, one day after Progreso and Intershoe had signed the "Loan Agreement." The luncheon was a social gathering and details of the Plaintiffs' Line were not discussed. Glasgow did not attend the luncheon.

261. Cowie arranged the luncheon. (U)

262. The luncheon complied with Progreso's request to be introduced to companies which had business dealings in Spain. Cowie did not recommend Intershoe to Plaintiffs at the luncheon or otherwise.

263. Rempel had met with Progreso officials before this luncheon.

264. At the luncheon, there was no discussion of credit and no discussion of specific loan arrangements.

265. There is no memorandum in the Progreso file memorializing the events at the luncheon.

266. Rempel requested a modification by letter dated May 7, 1990, which was directed to Progreso. (U)

267. Under the terms of the loan, Intershoe was required to repay the advances lent

by Progreso under the Plaintiffs' Line with title to the shoes being kept by Progreso (under documentary letters of credit) until repayment was made. Rempel wanted to eliminate the letter of credit aspect of the Plaintiffs' Line because Intershoe had always been on open account with the factories and Rempel did not want to set a precedent whereby the factories would come to expect letters of credit in the normal course of business.

268. Rempel asked to revise the Plaintiffs' Line to an *unsecured* line of credit.

269. On May 21, 1990, Progreso requested Intershoe's latest balance sheets and profit and loss accounts.

270. On May 31, 1990, Hoke forwarded to Leva Intershoe's most recent interim financial statements as well as projections for the months of May through August, 1990. These documents were forwarded to Caravantes on June 5, 1990.

271. On June 13, 1990, the Plaintiffs' Line was modified. (U)

272. Progreso did not eliminate the documentary credit aspect of the loan. By its June 13, 1990 Amendment to the Loan Agreement, Progreso permitted Intershoe to borrow money under the Plaintiffs' line either with documentary credits or without documentary credits. All advances were made without documentary credits. (U)

273. In the modification, the Plaintiffs raised the interest rate from the original London Interbank Offered Rates ("LIBOR") plus 0.5% to LIBOR plus 1.5%.

274. NatWest agreed with Mr. Leva's decision to modify the agreement. (U)

275. All advances made to Intershoe under the Plaintiffs' Line were unsecured loans. (U)

276. Leva gave up the security because it was "very busy" for Progreso. The decision to give up the security was not discussed with Signet. Plaintiffs could have maintained a security interest in the shoes in the United States.

277. Fairman was not advised of the modification and did not learn of it until approximately December 1993. He was not aware that the requirement of monthly financial statements had been eliminated.

278. As described by Robert Morris Associates, an independent association of bank loan and credit officers, an unsecured loan relies heavily on financial analysis and the strength of the borrower's general financial condition.

279. Financial analysis is important in determining whether to make a loan to a potential borrower. It is most important for unsecured lenders who do not have recourse to collateral for repayment of their loans. Progreso did not require Intershoe to submit monthly or interim financials which could have given the Plaintiffs useful information. Progreso's Risks Committee asked for financial information about Intershoe "all the time." Progreso did not obtain the information.

280. A prudent banker would have learned about lending practices and procedures in the United States if he were contemplating a loan here.

281. After the modification which allowed Intershoe to borrow funds on an unsecured basis, the Loan Agreements establishing and renewing the Plaintiffs' Line did not allow Progreso to cancel the loan or demand immediate payment of any amounts owed if Intershoe's financial condition deteriorated.

282. Progreso had no written policies for making loans, rating loans, or evaluating the creditworthiness of a borrower. (U)

283. NatWest had a written policy manual governing loan submissions and approvals. The Intershoe loan was not analyzed or monitored in the manner reflected in the policy manual.

284. The funds advanced on the line of credit were used to pay shoe factories in Spain. Progreso paid the factories. Intershoe was required to repay the advances within 60 days. (U)

285. Payments to the factories by Progreso were made by wire transfer, direct account transfer, and check.

286. Progreso was familiar with import-export transactions involving letters of credit. (U)

287. The Progreso employee charged with monitoring its line of credit to Intershoe was Juan Cazalla who worked for Leva.

288. Each payment was credited to Progreso's account at Signet Virginia in Richmond. (U)

289. Cazalla did not discuss Intershoe with any Signet Maryland employee while in Baltimore in October–November 1990.

290. In December 1990, Progreso received from Intershoe the audited financial statements for the year ending August 31, 1990, as indicated in Exhibit P54. These financials were passed along to NatWest. (U)

291. The audited financial statements revealed that there had been a large increase in trade payables during the fiscal year ended 1990. NatWest recognized that an increase in payables could be a sign of late payments to the trade. The audited financial statements also revealed substantial intercompany accounts receivable. Fairman marked the intercompany receivable, but Progreso and NatWest did not inquire further about its meaning. The audited financial statements also revealed that substantial payments to Westinghouse Credit Corporation had been deferred and that defaults had been waived. Progreso and NatWest were aware of these defaults and deferrals. It was the responsibility of both Progreso and NatWest to follow up on these concerns but neither ever did so.

292. In January 1991, Glasgow visited with Progreso officials in Madrid. At that time, Leva told Glasgow that Progreso was very happy with the relationship but that he thought Intershoe needed more equity.

293. The Plaintiffs' Line proved to be very profitable for Progreso until late 1991.

294. Glasgow telephoned Leva after their meeting in Madrid to report that TCR had indicated a willingness to provide equity to Intershoe.

295. On or about April 1, 1991, Progreso's loan officers for the Plaintiffs' Line recommended renewing it for another year.

296. The Plaintiffs' Line expired on April 30, 1991. (U)

297. Before April 30, 1991, Progreso, through Cazalla called Signet Maryland.

298. Cazalla contacted Signet Maryland as part of Progreso's process of renewing the line of credit. (U)

299. Cazalla spoke with Jean Derderian, an Assistant Vice President in Signet Maryland's International Division, for a credit reference on Intershoe. Cazalla told Derderian that the reason for the credit reference was that Progreso was doing its yearly renewal. (U)

300. Cazalla met Derderian when he visited Signet Maryland while on his training visit in Baltimore during October and November 1990. (U)

301. Cazalla called Derderian about Intershoe despite the fact that Derderian did not have any involvement with Signet Maryland's secured line of credit with Intershoe.

302. Derderian did not have knowledge of Intershoe sufficient to respond to a credit inquiry. Cazalla called her directly because he knew her and felt comfortable with her and because his English was "not the best."

303. Derderian would forward Cazalla's calls on Intershoe to Peter Godfrey. (U)

304. Godfrey did not speak with Cazalla about Intershoe.

305. On May 9, 1991, Cazalla called Derderian and Derderian asked Godfrey about Godfrey's opinion on Intershoe. (U)

306. Derderian spoke to Godfrey whose office was down the hall from her office. (U)

307. Derderian provided Signet Maryland's opinion to Cazalla by telecopy on May 9, 1991. The telecopy is Exhibit P63. (U)

308. Godfrey indicated that Signet Maryland's opinion of Intershoe was "favorable."

309. Godfrey would not normally have used the word "favorable" in response to a credit inquiry and did so in this instance

because of the way the request was made to him.

310. Cazalla did not speak with Godfrey about P63. He did not ask anyone at Signet Maryland for an explanation of what "favorable" meant to Signet personnel.

311. After Cazalla received the May 9, 1991 telecopy (P63), the Risks Committee of Progreso instructed Leva to get more information. Leva told Cazalla to do so.

312. On May 6, 1991, before receiving P63, Progreso advanced over $480,000 to Intershoe, as indicated on Exhibit D17. (U)

313. The Plaintiffs' Line to Intershoe expired on April 30, 1991. The renewal was signed on September 6, 1991. At any time between those dates the Plaintiffs could have refused to make further advances. (U)

314. Progreso forwarded P63 to NatWest. (U)

315. Fairman understood "favorable" to mean that the bank was satisfied that Intershoe was trading normally and could meet its obligations.

316. Both Godfrey and Bronfein confirmed that Signet Maryland's opinion of Intershoe in May 1991 was "favorable." As Bronfein indicated, "We liked Intershoe."

317. On May 21, 1991, Caravantes wrote a memorandum to Edwin Fairman, Head of NatWest's Risk Division, regarding NatWest's participation in a proposed renewal of the Plaintiffs' Line. The memorandum is Exhibit P66. (U)

318. At that time, NatWest possessed Intershoe's audited financial statements for the year ending August 31, 1990. (U)

319. Fairman recognized that the 1990 audited financial statements were "old." He did not ask for interim statements.

320. Caravantes recommended approval of renewing NatWest's participation in the Plaintiffs' Line, based on four factors. They were: (a) Return obtained; (b) Scrupulous compliance with each one of the due dates; (c) Improved financial condition; and (d) Opinion of Signet Banking Corporation, which introduced this company [Intershoe] to the bank.

321. At the time NatWest renewed the loan Caravantes had an unfavorable opinion of Intershoe. He did not call anyone at Signet for clarification of the May 9 telecopy. (P63). Fairman did not recall his opinion of Intershoe but would not have renewed the loan based on the financial statements.

322. In response to a request from Progreso, Derderian sent another telecopy to Cazalla on June 5, 1991. This telecopy is Exhibit P71. (U)

323. In both the May and June telephone calls, Cazalla did not tell Signet Maryland that Progreso would rely on the response and did not tell Signet Maryland that the inquiry was important to Progreso. Cazalla did not explain what degree of reliance, if any, Progreso would place on the response.

324. The cover sheet to the 6/5/91 telecopy to Cazalla says: "Juan, If you have additional questions, Peter would be pleased to discuss them with you. Jeanne."

325. The underlying document, with Peter Godfrey's name in the letterhead and dated June 5, 1991, states:

> Signet/Maryland's relationship with Intershoe, Inc. began in 1987. The Bank presently acts as Agent in a Bank Syndicate which provides a medium 8 figure Secured Line of Credit. The Syndicate also extends a high 8 figure Secured Foreign Exchange Line of Credit. All accounts are handled as agreed, and the relationship is satisfactory. Present outstandings on the Secured Line of Credit are a medium 8 figures. Outstandings on the Foreign Exchange Lines total a high 8 figures.

(U)

326. Signet Maryland's offer to provide further information to Progreso indicated a willingness to respond fully to the inquiry.

327. Signet employs the Robert Morris Associates Code of Ethics for the Exchange of Commercial Credit Information between Banks. (U)

328. In both May and June, Cazalla did not provide the information which Robert Morris Associates Code requires to be revealed when making a credit inquiry.

329. The typewritten portion of the telecopy of June 5, 1991 (P71) is a standard response to a credit inquiry and is in accordance with Robert Morris Associates guidelines for responding to credit inquiries.

330. Lassise reviewed the June 5, 1991 telecopy before it was sent to Progreso. She did not disagree with its contents. Bronfein and Godfrey also were of the view that the relationship between Signet and Intershoe was satisfactory and that the accounts had been handled as agreed.

331. Among the reasons for Signet Maryland's view that Intershoe was "satisfactory" were: Intershoe's "hot brands" and ability to sell shoes, its management team and systems, Signet Maryland's understanding of Intershoe's industry and customers, Signet Maryland's agreement with Intershoe's strategies, Signet Maryland's comfort with the quality of the collateral, Intershoe's strong performance in the fiscal year ending 1990 and the early months of 1991, the speed with which Intershoe obtained a $15,000,000 equity commitment from TCR, the excellent spring 1991 booking season, including record orders and shipments, the factors identified in the Signet Investment Banking Corporation's Private Placement Memorandum (P210), Intershoe's performance in a tough retail environment, and Intershoe's better-than-expected performance through the summer of 1991. Signet Maryland had "tremendous confidence" in Intershoe and it was a "coveted credit."

332. Godfrey did not intend to mislead Progreso in authorizing the sending of the May 9 telecopy (P63) or the June 5 telecopy (P71).

333. The telecopy sent by Derderian on June 5, 1991, stated that Signet Maryland's line of credit was *secured.*

334. On June 7, 1991, Progreso's PRC approved the renewal of Plaintiffs' Line as indicated on Exhibit P73. (U)

335. As a condition of approval the PRC directed that Progreso obtain frequent reports from Signet regarding Intershoe and frequent accounting statements from Intershoe.

336. NatWest renewed its agreement to assume half of the risk, as indicated on Exhibit P70. (U)

337. NatWest indicated that it wished to receive copies of the periodic reports received by Progreso. No such reports were ever received. (U)

338. If the Plaintiffs had refused to renew the line of credit to Intershoe, the bank group would have handled the situation in some fashion, including advancement of further funds to Intershoe, if necessary.

339. Progreso and Intershoe signed the documentation for the renewal of the Plaintiffs' Line on September 6, 1991. (U)

340. Leva did not talk with anyone at Signet Maryland or any other Defendant about the renewal. (U)

341. No one from Progreso or NatWest ever discussed Intershoe with anyone at PNB. (U)

342. No one from Progreso or NatWest ever asked Bank of Tokyo Trust Company or Westinghouse Credit Corporation for a credit reference on Intershoe.

343. No one from Progreso ever visited Intershoe at its offices in Millersburg, Pennsylvania. Leva, Boada and Cazalla all visited Baltimore in 1990. (U)

344. Between April 30, 1991 and September 6, 1991, Progreso made advances to Intershoe without a written loan agreement. Each advance was for a period of 60 days only. (U)

345. At any time between April 30, 1991, and September 6, 1991, Progreso and NatWest could have refused to make any advances to Intershoe because Plaintiffs' line had expired without renewal. (U)

346. Juan March never discussed Intershoe with any personnel at Signet Banking Corporation, Signet Maryland or Signet Virginia, and was not aware that Progreso had a line of credit to Intershoe.

E. EVENTS IN THE FALL OF 1991

347. The Revolver was due to expire on September 30, 1991, but was extended after September 30, 1991, for 60 days. (U)

348. Prior to September 1, 1991, Mellon Bank had been approached about forming a new bank syndicate for Intershoe's credit needs. To that effect, Mellon Bank provided a commitment letter on November 7, 1991. The letter is Exhibit P259. (U)

349. Signet Maryland agreed to participate in the bank group to be formed after September 30, 1991. Signet Maryland would not have been the lead lender.

350. On November 1, 1991, Signet Maryland approved its anticipated role as a minority participant in the Mellon syndication for up to $13 million on a revolving line of credit.

351. The Signet Loan Committee that approved the Mellon transaction recommended that the new loan be upgraded to a risk rating of 4.

352. Mellon Bank's commitment letter of November 7, 1991, was contingent in part on Intershoe's receipt of the TCR equity infusion, the bank's receipt of a draft of Intershoe's August 31, 1991, financial statements prepared by its outside accountants and other financial conditions including a minimum net worth of $6,533.726 to be reflected in Intershoe's August 31, 1991, audited financial statements.

353. On November 12, 1991, Mellon Bank confirmed to Lewis that a commitment letter for a new bank syndicate had been sent to Intershoe. Mellon Bank indicated that settlement of the new bank loan was set for November 26, 1991. (U)

354. On November 13, 1991, Intershoe provided Mellon Bank and Signet Maryland with its own internally prepared financial statements for the year ended August 31, 1991. On November 15, 1991, Mellon Bank informed Signet Maryland that Intershoe's draft audited financial statements for the year ended August 31, 1991 were expected to be available on November 20, 1991, with final statements to be available before the scheduled closing on November 26, 1991. (U)

355. On November 18, 1991, Rempel informed Signet Maryland that TCR had withdrawn its offer to invest $15,000,000 in new equity in Intershoe. (U)

356. On November 26, 1991, Signet Maryland learned that Intershoe's draft audited financial statements included a reference to a transaction with Intershoe's suppliers which resulted in an overstatement of Intershoe's Earnings Before Interest and Taxes by approximately $4 million and an understatement of Intershoe's Accounts Payable by a like amount.

357. On November 22, 1991, Lewis and Reymann met with Rempel and Dennis Bunder, an Intershoe director.

358. Rempel provided an explanation for the above $4 million transaction and revealed that, notwithstanding unexpected losses, he believed that Intershoe's problems were curable and he had already undertaken to address the problems by hiring a business turnaround consultant, Zolfo Cooper, to formulate a business plan.

359. After discussion, the existing bank group, with Signet Maryland as lead lender, decided to extend the existing loan through approximately December 13, 1991.

360. Signet Maryland also decided to downgrade the status of its loan to Intershoe to "substandard" which meant that the loan was placed on Signet Maryland's "watch list."

361. Progreso's Department of Risks sent a memorandum on December 3, 1991 to Leva which reminded him that continued approval of Progreso's loan hinged on obtaining "frequent" reports from Signet Banking about Intershoe.

362. Glasgow sent a telecopy dated December 17, 1991 to Progreso that indicated he had resigned from Intershoe on November 30, 1991. (U)

363. That telecopy (P77) indicates that it was sent at 02:25 on December 17, 1991. Given the six hour time difference between Spain and the United States, the telecopy would have been received by Progreso at approximately 8:25 a.m. Madrid time on December 17.

364. Progreso made an advance of $338,-870.65 to Intershoe on December 17, 1991.

365. On December 20, 1991, Progreso advanced $53,201.66 to Intershoe under the

Plaintiffs' Line, as indicated on Exhibit D17. (U)

366. On December 27, 1991, Progreso advanced $209,788.76 to Intershoe under the Plaintiffs' Line, as indicated on Exhibit D17. The three advances to Intershoe by Progreso after it learned of Glasgow's resignation totaled $601,861.07.

367. There was no discussion of any of these advances with Signet before any of the advances were made.

368. In December 1991, Intershoe instructed Signet Maryland that it was not authorized to release Intershoe's financial statements. (U)

369. Gamboa sought information from Lewis in December 1991 and Lewis stated that he was unable to give Gamboa any information about Intershoe.

370. On December 24, 1991, Gamboa sent a written request by telecopy to Intershoe for its most recent audited financials. (U)

371. That communication makes no mention of Glasgow; it only asks for the latest audited financial statements.

372. No advances were made to Intershoe on Plaintiffs' Line after December 27, 1991. (U)

373. On January 7, 1992, Gamboa informed Intershoe that Progreso would no longer make any advances on its line of credit until it received Intershoe's most recent audited financial statements. (U)

374. On January 17, 1992, Intershoe defaulted on Plaintiffs' Line by failing to repay the $375,260.45 in advances plus interest thereon which were due to be repaid on that date. (U)

375. Intershoe did not repay the advance due Progreso and NatWest on January 17, 1992. (U)

376. Prior to January 17, 1992, Intershoe repaid all advances and interest thereon due Progreso and NatWest. (U)

377. On January 21, 1992, Progreso sent a letter to Intershoe suggesting that the "relations" could be continued upon receipt of financials.

378. Progreso requested that Signet Maryland assist it in obtaining repayment of the advances which fell due on January 17, 1992. Signet Maryland indicated that it could not credit Progreso's account without Intershoe's permission. Intershoe refused to allow payment to Progreso. (U)

379. Despite Signet Maryland's inability to provide information to Progreso, Progreso kept calling Derderian. As a result, in February 1992, Lewis sent her a memorandum forbidding her to disclose information about Intershoe.

380. Signet had a fully secured position on November 14, 1991, with the value of collateral—inventory, accounts receivable and cash—exceeding the value of Intershoe's outstanding debt to Signet Maryland.

381. Defendants have not recovered from Intershoe all indebtedness owed them by Intershoe. They did recover $33,328,167.08. (U)

382. On February 18, 1992, Intershoe filed a petition in bankruptcy. (U)

383. No trustee was ever appointed in Intershoe's bankruptcy case. (U)

384. On March 12, 1992, Progreso filed a proof of claim in the Intershoe bankruptcy case. (U)

385. The Defendants filed proofs of claim in the Intershoe bankruptcy case. (U)

386. On March 30, 1992, NatWest paid Progreso $735,593.91, representing one-half (½) of Progreso's then loss on the Intershoe loan. (U)

387. Progreso acting for itself and NatWest voted to reject the Second amended Plan of reorganization filed by Intershoe in the bankruptcy proceeding. (U)

388. On January 6, 1993, Progreso filed this suit against the Defendants. (U)

389. Intershoe's Third Amended Plan of Reorganization (the "Plan") was approved by the Bankruptcy Court on January 20, 1993.

390. Plaintiffs did not participate in the Unsecured Creditors' Committee's activities. (U)

391. Leopoldo Caravantes did not act as Progreso's representative on the Unsecured Creditors' Committee. (U)

392. Signet Maryland, Signet Virginia, PNB/CoreStates and Tokyo Trust are secured creditors of Intershoe holding the first priority security interest in its inventory, accounts receivable and cash. Progreso is an unsecured creditor of Intershoe. (U)

393. The bank group expects to receive all outstanding amounts due from Intershoe, including interest and attorneys' fees, after the collection of Intershoe's accounts is completed.

394. Signet Maryland never had authority to determine which of Intershoe's creditors would be paid, and Signet Maryland did not manipulate or direct Intershoe to pay certain creditors ahead of others.

■ 395. It would have been improper for Signet to prefer Progreso over any other inquirer as to Intershoe's credit. Signet could not legally give Progreso any more information about Intershoe than it could give to any other such inquirer.

396. After receiving the May 9 and June 5, 1991 telecopies from Signet Maryland, the Plaintiffs should have made further inquiries and analyses. A credit inquiry response is only one factor in making a credit decision.

■ 397. There were numerous items known to Plaintiffs that should have been concerns at the time the loan was initiated and renewed. These included slow payments, highly leverage transaction issues, nonreceipt of financial information, deterioration in the 1990 financial statements, inability to monitor the company, the risk of an unsecured loan to Intershoe, and the recessionary economic environment. The Plaintiffs failed to comply with prudent banking standards by ignoring these concerns. The Plaintiffs also violated prudent banking standards by failing to visit Intershoe or to have substantive conversations about Intershoe with Signet.

398. The Plaintiffs ignored numerous late payments made by Intershoe on the line of credit. Calculating on 60 calendar days, 12 of 80 payments were late; using a 360–day calendar year, 10 of 80 payments were late.

■ 399. The Plaintiffs' monitoring of their loan to Intershoe was not in accordance with prudent banking standards.

400. The loan to Intershoe should have been constantly monitored by Progreso and NatWest. Special attention should have been paid to delinquent payment history. Because the loan to Intershoe was outside Spain, it involved more risk and should have been watched even more closely by Progreso and NatWest than a loan to a Spanish company.

■ 401. Prudent banking standards in Spain are no different from prudent banking standards in America.

402. If the Plaintiffs had complied with prudent banking standards, they would have reduced their chances of sustaining a loss.

■ 403. The Plaintiffs' purported heavy reliance on the May 9 and June 5 telecopies was not in accordance with prudent banking standards. If such reliance were to be placed on a response to a credit inquiry, the inquiry must be made at the highest levels. An inquiry from Cazalla to Derderian or Godfrey would not be an appropriate level. The level of reliance must be disclosed to the party of whom the inquiry is made and documented in the inquiring bank's file.

■ 404. Signet had no duty to update its responses to Progreso's inquiries. Banking practice does not require such updates. If Progreso wanted its inquiry updated, it should make another inquiry or inquiries. It was imprudent for the Plaintiffs to fail to make a further credit inquiry before signing the renewal of the Loan Agreement in September 1991.

405. The Plaintiffs' renewal and extension of their line of credit to Intershoe was not in accordance with prudent banking standards.

### III. Discussion.

The Plaintiffs must prove by clear and convincing evidence the elements of their fraudulent misrepresentation and fraudulent concealment claims and must prove by a preponderance of the evidence the elements of their negligent misrepresentation and un-

just enrichment claims. The parties have agreed that Maryland law controls. Trial Transcript, pages 2758, 2768, 3813 and 3814.

■ Under Maryland law, the elements of a cause of action for fraudulent misrepresentation are (1) that a defendant made a misrepresentation of a material fact which was false, (2) that its falsity was known to that defendant, (3) that that defendant made the misrepresentation for the purpose of defrauding the plaintiff, (4) that plaintiff suffered injury from the defendant's misrepresentation, and (5) that the plaintiff not only relied upon the misrepresentation but had a right to do so and would not have performed the act from which injury resulted if the misrepresentation had not been made. *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 469 A.2d 867, 888, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). Each of the foregoing elements must be established by clear and convincing evidence. *Weisman v. Connors,* 76 Md.App. 488, 547 A.2d 636, 642–43 (1988), *cert. denied,* 314 Md. 497, 551 A.2d 868 (1989).

■ The Plaintiffs have failed to establish by clear and convincing evidence or even by a preponderance of the evidence that Signet Maryland misrepresented its opinion of Intershoe. To the contrary, it is our view that Signet Maryland made no misrepresentations of its opinions to the Plaintiffs. In the spring of 1991 Signet Maryland's account officers for the secured revolving line of credit had a favorable opinion of Intershoe and believed that Intershoe would meet its obligations. The reports from the various meetings of the bank group show that Intershoe was achieving projections and continuing to show profits. As with all loans and particularly with highly leveraged transactions, the secured revolving line of credit involved risk but Signet Maryland's experience with so-called "asset-based lending" and with Intershoe itself was positive. Signet Maryland's statements of its opinion of Intershoe in the spring of 1991 as "favorable" and "satisfactory" was not a misrepresentation. Furthermore, Signet Maryland had no intention of defrauding or deceiving Plaintiffs.

■ Assuming arguendo that the Plaintiffs established that there was a misrepresentation and that the Defendants had the intent to defraud, Plaintiffs have failed to show that they justifiably relied upon the representations. To determine if Plaintiffs' alleged reliance was reasonable, the Court must "view the act in its setting which will include the implications and promptings of usage and fair dealing." *Parker v. Columbia Bank,* 91 Md.App. 346, 604 A.2d 521, 529, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992), *citing Giant Food, Inc. v. Ice King, Inc.,* 74 Md.App. 183, 536 A.2d 1182, 1186, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988). A plaintiff cannot establish that it justifiably relied upon a misrepresentation about a customer where the plaintiff had the ability and the right to investigate and thus could have performed its own investigation of the customer. *Id.* In fact, Plaintiffs clearly should have done so.

Plaintiffs decided to extend a loan to Intershoe after Signet Banking Corporation introduced Intershoe, at Intershoe's request, as a potential loan customer and indicated that its relationship with Intershoe had been a good one. Signet Banking Corporation did not encourage the Plaintiffs to make any loan and certainly did not recommend that Plaintiffs make an unsecured loan.

In the present case, the officers and employees of Plaintiffs were sophisticated bankers, familiar with international banking transactions involving letters of credit. Plaintiffs initially took some precautions to protect themselves. For example, Plaintiffs first structured the line of credit to require Intershoe to borrow funds under "documentary credits" which would have allowed Plaintiffs to retain title to the shoes pending repayment of the banks' advances from Intershoe. Plaintiffs also in the beginning required monthly financial statements from Intershoe. Plaintiffs under the first loan agreement reserved the right at any time not to extend credit to Intershoe, allowing Plaintiffs to cancel the line at their discretion. Intershoe requested modification of these terms and Plaintiffs without asking Signet Maryland or anyone else agreed to dispense with those protections. Plaintiffs also initial-

ly sought a personal guarantee of Intershoe's obligations from Ivan Rempel, chief officer and stockholder of Intershoe, but when Rempel declined, did not insist on the guarantee. Finally, Plaintiffs knew that Intershoe had a large amount of debt in relation to its equity and had approximately $40,000,000 in secured debt to a banking syndicate. Plaintiffs' alleged "reliance" on Signet Maryland's statement cannot in light of the evidence have been justified.

Beyond the weakening of its loan terms and covenants, Plaintiffs' employees and officers as even Plaintiffs' own expert concedes failed to act as prudent bankers act. Such bankers perform their own "due diligence" inquiries and make their own credit evaluations of potential borrowers. Plaintiffs did not do so. Prudent bankers monitor and review their loans regularly. Plaintiffs did not do so. Prudent bankers demand current financial statements before renewing loans. Plaintiffs did not do so.

Progreso's loan officers recommended renewal of the line of credit to Intershoe which was to expire April 30, 1991, on or about April 1, 1991. After the line of credit had expired but three days before receiving the alleged "critical" Signet Maryland opinion, Progreso advanced over $480,-000 to Intershoe. Progreso's willingness to advance such a large sum without the benefit of Signet Maryland's opinion illustrates that it did not rely—much less justifiably rely—on the telecopies of May 9 (P63) and June 5, 1991 (P71). The renewal agreement between Progreso and Intershoe was not executed until September 6, 1991.

We turn now to the fraudulent concealment claim. The elements of fraudulent concealment are: (1) a duty to disclose; (2) a failure to disclose a material fact; (3) an intent to deceive; and (4) an injury to plaintiff as a result. *Finch,* 57 Md.App. 190, 469 A.2d at 888. These elements also must be proven by clear and convincing evidence.

Signet Maryland had no duty to disclose material information about Intershoe to Progreso by revising or updating the opinions given in the Spring of 1991. A duty of disclosure arises only out of a fiduciary or confidential relationship, *Parker,* 91 Md.App. 346, 604 A.2d at 531–32. Under Maryland law a bank will not become subject to a fiduciary duty unless the bank has expressly accepted such a duty. *Id.,* 91 Md.App. 346, 604 A.2d at 533, (noting that a fiduciary duty must be consciously assumed). This restriction on the imposition of a fiduciary duty on a bank comports with other traditional restrictions, both in Maryland and elsewhere. Correspondent banking relationships do not give rise to fiduciary duties. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984). Lenders are not fiduciaries for their borrowers. *See, e.g., Yousef v. Trustbank Savings, F.S.B.,* 81 Md.App. 527, 568 A.2d 1134, 1138–39 (1990), and a payor bank does not owe a duty to other banks in the chain of collection for checks. *Alta Vista State Bank v. Kobliska,* 897 F.2d 930, 933–34 (8th Cir.1990). Moreover, a fiduciary relationship does not arise from a lender participation agreement unless the agreement expressly provides for such a relationship. *First Citizens Federal Sav. And Loan Association v. Worthen Bank and Trust Company, N.A.,* 919 F.2d 510, 513–14 (9th Cir.1990).

In this case there is no evidence, let alone evidence that is clear and convincing, that Signet Maryland ever consciously assumed a fiduciary duty to Progreso. Progreso cannot "abandon all caution and responsibility for [its] own protection and unilaterally impose a fiduciary relationship" on Signet Maryland. *Parker,* 91 Md.App. 346, 604 A.2d at 533. Furthermore, Signet Maryland and Progreso did not have a confidential relationship based on common ownership and sharing a common director as Progreso has alleged. There is no legal support for the notion that a fiduciary duty may be created between two large corporations simply because they have a common shareholder and director. Banca March held 15.-22% of the stock of Signet Banking Corporation. Given a lack of legal support for Plaintiffs' argument, it is inconceivable that a fiduciary duty flowed from Signet Maryland to Progreso by reason of March's status as a common shareholder. Similarly, there is no support for the argument that sharing a com-

mon director will create a fiduciary duty between two corporations. Indeed, in Alta Vista, the Court of Appeals for the Eighth Circuit rejected the notion that sharing a common agent may create a fiduciary duty. 897 F.2d at 933–34. Furthermore, the fact that various employees of Progreso came to the United States for training at Signet does not create a fiduciary duty. We also see no fiduciary duty or special relationship between Signet Maryland and Progreso arising from the fact that Braxton Glasgow resigned as an officer of Signet Investment Banking Corporation in October 1989 to take a position with Intershoe. Finally, as with the fraudulent misrepresentation count Plaintiffs have failed to show by clear and convincing evidence or even a preponderance of the evidence that Signet Maryland failed to disclose material information with the intention of deceiving Progreso.

■ We now turn to the negligent misrepresentation claim. The elements of negligent misrepresentation are (1) that the defendant owing a duty of care to the plaintiff negligently makes a false statement, (2) the defendant intends that the statement be acted upon by the plaintiff, (3) the defendant knows that the plaintiff will probably rely on the statement, which if erroneous, will cause loss or injury to the Plaintiff, (4) the plaintiff, justifiably, takes action in reliance on the statement, and (5) the plaintiff is injured because of the defendant's negligence. *Village of Cross Keys, Inc. v. U.S. Gypsum Co.,* 315 Md. 741, 556 A.2d 1126, 1133 (1989). The Plaintiffs must establish all of the elements of negligent misrepresentation by a preponderance of the evidence.

■ Signet Maryland did not owe a duty of care to Progreso. Under Maryland law the duty of care required to sustain a claim of negligent misrepresentation is quite limited. *Village of Cross Keys,* 315 Md. 741, 556 A.2d at 1133 (noting that liability for negligent misrepresentation is more limited than that for fraudulent misrepresentation, and liability in a negligent misrepresentation claim for economic loss is more restrictive than the liability in a case where physical injury has resulted). In a claim of negligent misrepresentation involving only economic

loss, there must be an "intimate nexus" between the plaintiff and the defendant. *Id.,* 315 Md. 741, 556 A.2d at 1131. The plaintiff must demonstrate "contractual privity or its equivalent" to satisfy the "intimate nexus" requirement. *Id.* Here Progreso did not have a contract with Signet Maryland to provide information about Intershoe. As a matter of fact there was no contract at all between the two. Thus, there was no contractual privity. Nor was there a special relationship of confidence between Progreso and Signet Maryland for the same reason as previously explained. Signet Maryland did not owe a duty of care to Progreso. Furthermore, as previously explained, Signet Maryland did not misrepresent its opinions of Intershoe to Progreso and there is no evidence that Signet Maryland intended that Progreso act on its opinions to extend an unsecured loan to Intershoe. There is no evidence that Peter Godfrey, the account officer who issued the opinions for Signet Maryland in the spring of 1991, knew that Progreso would rely solely on the opinions to extend or renew an unsecured loan to Intershoe and Progreso did not justifiably rely on the opinions as given by Signet Maryland in the spring of 1991.

■ A plaintiff is contributorily negligent when it fails to take appropriate precautions to protect its own interests. *Wegad v. Howard Street Jewelers, Inc.,* 326 Md. 409, 605 A.2d 123, 127 (1992). Under Maryland law a plaintiff's contributory negligence completely bars recovery by the plaintiff on a negligence claim no matter how slight the plaintiff's fault may be. *E.F. Hutton Mortgage Corporation v. Pappas,* 690 F.Supp. 1465 (D.Md.1988). The evidence demonstrates that Progreso acted negligently by failing to take reasonable measures to protect itself. Progreso initially took steps that would have provided some protection for the risk involved in lending money to a highly leveraged company such as Intershoe. For example, it initially structured the line of credit to require Intershoe to borrow funds under "documentary credits" which would have allowed Plaintiffs to retain title to the shoes pending repayments of the bank's advances by Intershoe. It also initially re-

quired monthly financial statements from Intershoe and reserved the right at any time not to extend credit to Intershoe with power to cancel the line of credit at its discretion. Progreso, however, decided to dispense with these reasonable measures. Progreso's actions were not consistent with banking industry standards. Progreso acted negligently and its contributory negligence bars recovery on its negligent misrepresentation claim. The Plaintiffs have failed to establish this claim.

 We turn now to the unjust enrichment claim. In order to sustain a claim based on unjust enrichment a plaintiff must establish a benefit conferred upon the defendant by the plaintiff, appreciation or knowledge by the defendant of the benefit, and acceptance or retention by defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment to Plaintiff of its value. *Mass Transit Administration v. Granite Constr. Co.,* 57 Md.App. 766, 471 A.2d 1121, 1125 (1984).

 Progreso's unjust enrichment count alleges that Defendants were enriched by Progreso's advances to Intershoe. Defendants were either fully secured before Plaintiffs' advances occurred or, if not fully secured, they were secured to within a hair's breadth of full security, considering the magnitude of Defendants' claim. However, if any benefit from the Plaintiffs' advances was realized by Defendants, it was only realized upon recovery in the bankruptcy proceedings. Thus, the unjust enrichment claim challenges the treatment and amount of the Defendants' claim in the bankruptcy proceedings. A challenge to the Defendants' secured claim could have and should have been raised before the Bankruptcy Court. The doctrine of res judicata or claim preclusion gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in an earlier proceeding. *Bd. of Tr. of Trucking Emp. Pension Fund v. Centra,* 983 F.2d 495, 504 (3rd Cir.1992). Progreso had the right to object to Defendants' secured claim in the bankruptcy case. 11 U.S.C. § 502(a); *In Re Charter Co.,* 68 B.R. 225, 227–28 (Bankr.M.D.Fla.1986), *aff'd*

862 F.2d 1500 (11 Cir.1989); 3 Collier on Bankruptcy ¶ 501.01[2], at 502–14 (15th ed. 1993). Any creditor, including Progreso, could have challenged Signet Maryland's claim. 11 U.S.C. § 1109(b). If Progreso had done so, the Bankruptcy Court could have reduced Signet Maryland's claim to invalidate any inequitable improvement in position. 11 U.S.C. § 502(b); 11 U.S.C. § 105. Progreso's failure to do so bars its unjust enrichment claim by res judicata or claim preclusion.

 Moreover, if the Defendants did receive any benefit from Plaintiffs' advances to Intershoe, they did not retain it under such circumstances as to make it inequitable for them so to do. We are of the view that Progreso cannot succeed on its unjust enrichment claim also because Progreso consciously decided to make advances to Intershoe in the face of insufficient information, did not act prudently when it failed to require monthly financial statements although entitled to do so and converted itself from a secured creditor with respect to Spanish shoes into a general, unsecured creditor. Equity will not aid someone who deliberately foregoes an opportunity to discover material facts. *Morgan Guaranty Trust Company v. American Savings and Loan Association,* 804 F.2d 1487, 1494 (9th Cir.1986); *see also Gaudiosi v. Mellon,* 269 F.2d 873 (3rd Cir. 1959) (one who comes into equity must come with clean hands); *In re North Broadway Funding Corp.,* 34 B.R. 620, 623 (Bankr. E.D.N.Y.1983) (equity should not intrude "to relieve a party from a conscious course of action"). Under the facts in this case, we will not relieve the Plaintiffs of the foreseeable consequences of their conscious course of action.

### IV. Conclusions of Law.

1. Plaintiffs have failed to establish the elements of a claim of fraudulent misrepresentation by clear and convincing evidence.

2. Plaintiffs have failed to establish the elements of a claim of fraudulent concealment by clear and convincing evidence.

3. Plaintiffs have failed to establish the elements of a claim of negligent misrepresentation by a preponderance of the evidence.

4. Plaintiffs have failed to establish the elements of a claim of unjust enrichment by a preponderance of the evidence.